WICK et al. v. McLENNAN.　(No. 5603.)

(Court of Civil Appeals of Texas. San Antonio. March 15, 1916. Rehearing Denied May 31, 1916.)

1. BROKERS ☞86(4) — ACTION FOR COMMISSION—SUFFICIENCY OF EVIDENCE.

Evidence in an action for commissions due on the sale of real estate as agent for defendants, *held* to sustain a finding that plaintiff was the procuring cause of a sale by defendants to a certain purchaser.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 117; Dec. Dig. ☞86(4).]

2. BROKERS ☞56(3)—CONTRACT FOR COMMISSION—CONSTRUCTION.

Under an agency contract providing that plaintiff should receive a commission "on all sales to customers furnished and sales closed," through the efforts of himself and subagents, the agent was not required both to procure the customer and also close the sale before being entitled to a commission.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 86–89; Dec. Dig. ☞56(3).]

3. APPEAL AND ERROR ☞930(1)—REVIEW—QUESTION OF FACT.

On appeal from a judgment for plaintiff in an action for commissions, the Court of Civil Appeals, in deference to the verdict for him, must take his testimony as true.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3755, 3756, 3758; Dec. Dig. ☞930(1).]

4. PARTNERSHIP ☞296(3)—ACTION FOR COMMISSION—SUFFICIENCY OF EVIDENCE.

In an action for real estate commissions on certain sales under plaintiff's agency contract with defendants, evidence *held* to sustain a finding that there had been no dissolution of the defendants' firm when the contract of sale was made.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 662, 673; Dec. Dig. ☞296(3).]

5. PARTNERSHIP ☞296(3)—ACTION FOR COMMISSION—BURDEN OF PROOF.

In an action against several as partners to recover commissions for the sale of real estate under an agency contract, where the evidence was that the land sold had been controlled by the partnership and was controlled by it, unless it had been dissolved, and where the issue submitted was whether it was controlled by the partnership or by one of the partners individually, equivalent to the question whether the partnership had been dissolved before the making of the contract, the burden of proof was on the defendants.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 662, 673; Dec. Dig. ☞296(3).]

---

6. Brokers ⊚⇒86(8), 88(14)—Action for Commissions—Sufficiency of Evidence.

In such action, finding for plaintiff for $3,-155, *held* not supported by the evidence and the pleadings.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 117, 130; Dec. Dig. ⊚⇒86(8), 88(14).]

7. Evidence ⊚⇒138—Similar Acts—Brokers—Action for Commissions.

In such action the fact that plaintiff's wife, in his absence, was asked to identify one of the defendants at a bank to enable him to draw money, was inadmissible to prove that certain checks given by such defendant to plaintiff were given under the same circumstances.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 414, 414½; Dec. Dig. ⊚⇒138.]

8. Brokers ⊚⇒85(1) — Action for Commission—Issues—Evidence.

In such action, where defendants admitted that plaintiff was entitled to a commission on a certain sale, but contended that he was entitled to only half of the amount claimed, and did not claim that they had paid any part of the commission to any one else or were liable to any one else, the purchaser's testimony that he had a commission contract with plaintiff and that he claimed a commission on such sale which defendant had declined to pay was irrelevant.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 106, 108, 110, 115; Dec. Dig. ⊚⇒85(1).]

9. Assignments ⊚⇒33—Construction—Broker's Commission.

In an action upon an agency contract whereby plaintiff was to receive commission on the sale of realty to which an assignment was attached, whereby it was agreed between the parties that all commissions earned or to be earned on the contract should be assigned to plaintiff's wife, signed by both of the parties, the refusal of a charge for defendant, that by reason of the assignment plaintiff had no cause of action, was not erroneous.

[Ed. Note.—For other cases, see Assignments, Cent. Dig. § 64; Dec. Dig. ⊚⇒33.]

Appeal from District Court, Bexar County; W. F. Ezell, Judge.

Action by L. W. McLennan against Frank W. Wick, J. G. Fowler, and C. S. Fowler, as partners in the Wick-Fowler Colonization Company, with counterclaim by defendants. Judgment for plaintiff against defendants, and for defendants Fowler over against defendant Wick, and defendants appeal. Reversed, and cause remanded.

Ball & Seeligson and C. W. Trueheart, all of San Antonio, for appellants. Swearingen & Ward and John H. Bickett, Jr., both of San Antonio, for appellee.

MOURSUND, J. Appellants' statement of the case is adopted, as follows:

Plaintiff (appellee), in his first amended original petition, sought to recover from Frank W. Wick, J. G. Fowler, and C. S. Fowler, as partners in the Wick-Fowler Colonization Company, certain real estate commissions claimed due on a sale made to J. A. Burton and a sale to P. E. Nispel and E. S. Krause, under a general agent's contract with said partnership, a copy of which contract was attached to the petition as an ex-

hibit. In addition to stating that plaintiff was the procuring cause of said sales, this petition, in line with the terms of this contract, alleged that said sales were closed through the efforts of plaintiff, and that the lands sold were controlled by the Wick-Fowler Colonization Company. On the Burton deal, $2,560 was claimed due, as of July 6, 1912, and on the Nispel and Krause deal, $640, it being alleged with reference to the latter that there was a special verbal agreement that plaintiff should have $4 per acre on the 160 acres sold, instead of $2 per acre, the amount provided for exchanges in the written contract.

Defendants' first amended original answer alleged, under oath, that the Wick-Fowler Colonization Company was dissolved about June 1, 1912, and that said partnership had no interest whatever in the Burton sale, afterwards made, and denied that the land sold was, at the time of sale, controlled by said partnership. It was further alleged by defendants that, after plaintiff had attempted and failed to sell the land for the Wick-Fowler Colonization Company to J. A. Burton and J. F. Ringler, the defendant Wick, individually, contracted with Mrs. Shaw, the then owner of said land, that she should deed this land to whomsoever Wick designated, and that immediately thereafter, on June 26, 1912, Wick himself procured the contract of sale with J. A. Burton and his wife, under which contract this property was, on July 6, 1912, deeded by Mrs. Shaw to J. A. Burton. It was further denied by the defendants that plaintiff was the procuring cause of this sale, or that same was closed through his efforts, but defendants alleged that, on June 15, 1912, plaintiff was discharged, and notified of his discharge, by the Wick-Fowler Colonization Company for violations of his employment contract, for selling lands in South Texas, other than lands the sale of which was controlled by said firm, and that prior to this time he had been notified of the dissolution of this firm and had himself virtually abandoned his employment with them; that plaintiff had represented that he would not claim a commission on this Burton deal, and that Wick had acted upon this representation when he closed his contract with Burton. With reference to the Nispel deal, it was admitted by defendants that a commission had been earned by plaintiff on same, but defendants alleged that this was an exchange of lands, upon which $2 per acre, instead of $4, was to be paid, and that all of the $320 that was due had actually been paid plaintiff. Attached to this pleading, as an exhibit, was an itemized statement showing commissions earned by plaintiff, and advancements made on same by defendants, and the balance due defendants of $1,451, which amount defendants asked might be offset against anything found due plaintiff.

Plaintiff's first amended first supplemental

petition, after denying most of the defendants' allegations, and reaffirming the original contentions of plaintiff, alleged that Wick, on June 15, 1912, had fraudulently canceled plaintiff's contract with a view to precluding plaintiff from receiving a commission on the Burton deal, which he contended had previously been worked up and all but concluded by plaintiff, and that Wick's transactions with Mrs. Shaw were part and parcel of such fraudulent scheme on the part of defendants. Plaintiff further set up the statute of two years' limitation against defendants' counterclaim for advancements, also alleging that certain of these items of advancement shown in defendants' first amended original answer covered the Lower deal and the Neal deal, not charged in the account by plaintiff of the commissions earned, while other items, particularly a check of April 3, 1912, for $200, payable to Mrs. Lula I. McLennan, represented checks cashed for defendant Wick by plaintiff.

The defendants filed a first supplemental answer, denying the allegations of plaintiff's first amended first supplemental petition; and prior to the announcement of ready, defendants also filed their trial amendment, which withdrew from the account of commissions paid by defendants to plaintiff the above item for $200, and added to defendants' account of commissions paid an item of $125, and to the account of commissions earned by plaintiff the like sum, due plaintiff by defendant Wick personally on the Neal deal.

The case was submitted to the jury upon special issues, and on the basis of the jury's answers to these, judgment was rendered, on May 13, 1915, in favor of plaintiff, and against all the defendants, for the sum of $3,155.04, together with interest and costs, and in favor of the defendants C. S. Fowler and J. G. Fowler for a like sum over against the defendant Frank W. Wick. The amount of the judgment, as shown by the decree, as well as by the verdict of the jury, was made up as follows: $2,560, together with interest amounting to $438.18; $320 on the Nispel deal, together with interest amounting to $53.86; and a deduction of $200, together with interest thereon amounting to $17, representing advancements made by the defendants, and allowed as a credit on the amount due plaintiff.

The questions submitted to the jury, with the answers thereto, were as follows:

"Q. (1) Was plaintiff, McLennan, the procuring cause of the trade which was actually consummated by J. A. Burton and wife, purchasing the 1,280 acres of land in Victoria county, Tex.? By 'procuring cause,' as used in this connection, is meant that the efforts, acts, and negotiations, if any, of plaintiff, McLennan, induced the trade which was actually made. Ans. Yes.

"Q. (2) Did the Wick-Fowler Colonization Company, through F. W. Wick, for good cause, and in good faith, cancel their contract with plaintiff, McLennan, on or about June 15, 1912? Ans. No.

"Q. (3) By whom was the 1,280 acres of land purchased by Burton and wife in Victoria county, controlled for purposes of sale at the time the contract of sale was made, between Burton and wife and Wick which was actually consummated? Ans. Wick-Fowler Colonization Company.

"Q. (4) Did the plaintiff, McLennan, state to J. A. Burton, before the making of the contract between Burton and wife and Wick, which was actually consummated, that he (McLennan) would not claim any commission if Burton purchased or traded for the 1,280 acres in question, and did Burton communicate such statement, if any such was made, to Wick, and did Wick rely upon said statement, if any such was made, in closing the trade? Ans. No.

"Q. (5) Did the defendants or either of them agree to pay plaintiff, McLennan, $4 per acre commission on the land purchased by Nispel and Krause in Victoria county, or was he to receive only $2 per acre as provided in the written contract? Ans. Two dollars per acre.

"Q. (6) What amount do you find from the evidence that L. W. McLennan received in cash as advances or otherwise from Wick and Wick-Fowler Colonization Company that should be allowed defendants as a credit on all commissions earned by plaintiff, McLennan, on the sales made by him under his contract? Ans. Twenty-five hundred and fifteen dollars.

"Q. (7) What amount do you find from the evidence was earned by McLennan as commissions on sales of land made by him under his contract with the Wick-Fowler Colonization Company? And in this connection, you are instructed not to consider either the Burton or Nispel deal, in fixing this amount, as these issues are submitted in previous questions. Ans. Twenty-three hundred and fifteen dollars.

[1] By the first assignment of error it is contended that the answer to the first issue submitted to the jury is contrary to and wholly unsupported by the evidence. The testimony of McLennan and Burton shows that Burton became interested in the Shaw land through the efforts of McLennan; that Burton finally agreed, in May, 1912, to buy the land if he could make satisfactory arrangements; that Wick met Burton and McLennan in McLennan's office in Lincoln, Neb., and the price of the Shaw land, as well as the price of the lands owned by Burton to be taken as part payment, was agreed upon. The only difficulty resulted from the fact that the owner of the 1,280 acres wanted $4,000 in cash. Burton and McLennan tried to borrow $10,000 on Burton's land, but were unable to do so, so Wick returned to Texas to arrange for some money. Wick returned to Nebraska and closed a deal with Burton and wife, on June 26, 1912, in accordance with the prices agreed upon about June 1st and without requiring any cash payment. He testified that on this trip he again visited Burton's lands and while there met a man from Iowa who agreed to buy part of the land for cash if Wick became the owner, and appellants contend that as McLennan did not discover the man from Iowa he cannot be held to be the procuring cause of the trade being made. It appears from the testimony of McLennan and his wife that while the trade was being discussed in the early part of June Wick tried to get McLennan to accept the equity in a certain place in Lincoln as his commission. Wick did not testify that he failed to raise the money in Texas, and

his return to Lincoln indicates that he was prepared to close the trade without exacting any cash from the Burtons. It is not at all clear that he would not have closed had he not discovered the man from Iowa. It is frequently the case that terms are changed and even the price, and frequently many things conduce to cause a trade to be finally closed. It is indeed difficult to determine sometimes whether or not the agent is the procuring cause of a trade being consummated, but we think the evidence is sufficient in this case to justify the jury in finding that the sale to Burton was induced and brought about by McLennan. Hancock v. Stacy, 103 Tex. 219, 125 S. W. 885; McDonald v. Cabiness, 100 Tex. 615, 102 S. W. 721; same case in Court of Civil Appeals, 98 S. W. 943.

[2] It may be said in this connection that McLennan sued upon a contract which provides that McLennan is to receive a commission "on all sales to customers furnished and sales closed through the efforts of said second party and of his subagents." It was not contended that this clause is ambiguous, and no testimony was introduced to show what was meant thereby. Does it mean that McLennan must not only procure the customer, but must also close the sale before being entitled to commission? We think not. The parties do not appear to have so construed it, for Wick did not refuse to pay on any such ground. The word "sales" is mentioned twice, thus indicating an intention to pay commissions not only on all sales to customers furnished by McLennan, but also on all sales which should be closed by him.

Assignments 1, 2, and 3 are overruled.

[3, 4] By assignments 4 and 5 it is contended that the uncontroverted evidence shows that when the second Burton sale was closed Wick was the only person who controlled, for the purpose of sale, the 1,280-acre tract of land purchased by Burton. There can be no doubt from the evidence that the Wick-Fowler Colonization Company had controlled this land, and still controlled it at the time of the contract, unless the members of said firm had dissolved their partnership. Wick testified the firm was dissolved on May 29, 1912, by verbal agreement between Wick and J. G. Fowler, and the other members of the firm fixed the time at between May 25 and June 1, 1912. They testified that the firm was not interested in the Burton deal as finally made, but that it was made by Wick individually. The agent of the owner of the land testified to making an oral agreement with Wick, individually, between June 15 and June 20, 1912. It appears that Wick at that time and also when he closed the deal with Burton stated that the partnership had been dissolved. On the other hand, if McLennan is to be believed, and we must take his testimony as true in deference to the verdict of the jury, Wick said nothing to him about the dissolution of the firm at the

time the trade was being discussed during the first week of June, 1912. Taking this testimony as true, it appears that Wick failed to notify McLennan that he no longer had any contract, but on the contrary telegraphed him on June 1st from Omaha, and availed himself of his services for several days without saying a word about any dissolution of the firm. It further appears that on June 15th Wick wrote McLennan a letter signed in the firm name, canceling his agency contract on the ground that its terms had been violated by him, and stating that he would not be recognized "as having any interest in any sales or real estate transactions which we may negotiate in the future." No mention is made in this letter of the dissolution of the firm. A draft given in the Nispel deal, dated July 20, 1912, payable to the order of the Wick-Fowler Colonization Company and so indorsed by Wick as manager, was introduced in evidence. It appears that there was a corporation by the name of Fowler Bros. Land Company, of which C. S. Fowler was president, and J. G. Fowler secretary and treasurer. Two letters to McLennan by this corporation appear in the statement of facts, one dated June 12, 1912, in which receipt of a letter dated June 7th is acknowledged, and promise made to take care of him if he should come down on the 18th. This letter was signed by C. S. Fowler as president of the corporation. The other was dated February 15, 1913, in reply to two letters by McLennan. It stated that the writer, J. G. Fowler, was waiting until he could communicate with Wick, in order to give a definite answer concerning the various phases of McLennan's letters. Prior to the execution of the agency contract sued upon McLennan had a similar contract with Fowler Bros. Land Company. Wick signed all checks to McLennan, and had the general management of the business. Letter heads of "Wick-Fowler Colonization Co." were introduced, on which letters signed by Wick, written November 16, 1912, and October 29, 1912, were introduced in evidence. McLennan testified he never heard of the dissolution of the firm until April, 1913, when he came to see Fowler Bros. about paying his commission.

We believe the foregoing is a fair statement of the evidence upon the question raised by appellant. The court placed the burden of proof upon defendants upon the issue, and the jury found there had been no dissolution of the firm at the time the contract of sale was made. We have carefully considered the matter, and conclude that the jury, in the exercise of its right to judge of the credibility of the witnesses, could arrive at such conclusion.

[5] In this connection we will consider the contention made under assignment No. 6 to the effect that the court erred in instructing the jury that as to question No. 3 the burden of proof was upon the defendant. The evi-

dence showed that the land had been controlled by the partnership and was still controlled by it, unless it had been dissolved. This is recognized by appellants, for under the two preceding assignments the sole contention is made that the partnership had been dissolved about May 29th, and that therefore the land was controlled by Wick individually. The court, in framing the question, stated that the jury should answer: "By Wick-Fowler Colonization Company or by Wick individually." This was, of course, an assumption that it was controlled either by the firm or by Wick, which assumption was correct under the evidence, and no objection was made thereto. We think that for all practical purposes the issue can be treated as the equivalent of the question whether the partnership had been dissolved prior to the making of the contract, and on such issue it appears to us that it would have been improper to place the burden on plaintiff of establishing the negative. We therefore overrule the sixth assignment.

[6] Appellants contend that the answer to question 7 is unsupported by the evidence and the pleadings. This answer is a finding that McLennan had earned as commissions on sales made by him under his contract, exclusive of the Nispel and Burton deals, the sum of $2,315. Defendants pleaded that plaintiff was indebted to them in the sum of $1,451 by reason of the fact that the Wick-Fowler Colonization Company had advanced and paid to him that sum in excess of commissions earned by him. The items paid him were set out, the aggregate thereof being $2,853.50. The items of commission earned were set out, aggregating $1,402.50, which, however, included $320 on the Nispel deal. Plaintiff denied that said account showed all commissions which were earned by him and were due to him by the company, and denied there was any balance due by him to the defendants. He specially denied the justness of the charge of $100 on June 5, 1911, and $100 on July 8, 1911, on the ground that they were given him in payment of his commission for trading to one John Neal a certain brick building which he alleged was the property of defendants. He also denied the justness of the charge of $675 on December 4, 1911, and of $100 on December 9, 1911, because said sums were paid him in settlement of his commission for the sale of lands of D. E. and R. A. Lower. He alleged that he was not given credit for any of such commissions in the account of defendants, though he is charged with payment of same. Defendants denied these allegations. In a trial amendment defendants alleged that to the items of commissions there should be added $125 due plaintiff as commission on a sale to John Neal, made by Wick personally, and $176 to the account of sums paid plaintiff, which item covered the payment by the defendants of said $125, together with other amounts incurred by plaintiff as expenses. These pleadings made the issue whether, aside from the Burton and Nispel deals, plaintiff was indebted to defendant. The court, in trying to have this issue determined, framed question No. 7, without objection from either party, so as to require a finding as to amount of commissions earned under the contract. The jury found a greater amount than was even suggested by plaintiff, for the only items in addition to those mentioned in defendant's account suggested by plaintiff are the following: Amount on Lower deal $750; amount on Neal deal $200; amount on Bennett deal $176.80. These amounts, added to the $1,082.50, make a total of $2,209.30, while the jury found the amount to be $2,315. It also appears that the Bennett item was not pleaded by plaintiff, and he testified it was earned from Wick individually and paid by him, and that it did not appear on either side of the account pleaded by defendants. Defendants by their trial amendment attempted to add the amount of $176.80 to their account of advancements made, but upon the theory that it included the commission on the Neal deal and certain expenses. We cannot say whether the jury added such amount to each side of the account in answering questions 7 and 8. While there is evidence that defendants charged plaintiff with payments made in settlement of the Lower, Neal and Bennett deals, there is no evidence that these sums were earned as commissions under the contract. They were all earned before the contract was made, and the Neal and Bennett ones were paid before it was made, if plaintiff's testimony is correct. The Lower deals were not completed until in December, 1912, and according to plaintiff the commissions were then paid, but the contracts were signed before the contract between plaintiff and defendants was made. Appellee contends that even if we find in accordance with appellants' contention the error is harmless, because the pleadings and evidence would warrant the court in finding the amount of expenses paid for defendants by plaintiff and the amount of advances by plaintiff to defendants. This contention is based on the theory that issues not submitted and not requested to be submitted are to be found so as to support the judgment, provided there be evidence upon which they can be based. The court submitted in question 8 to find what amount plaintiff received in cash as advances or otherwise from the company that should be allowed defendants as a credit on all commissions earned by plaintiff on the sales made by him under his contract. The jury answered $2,515. In answering this question it was the duty of the jury to exclude all items paid plaintiff to pay expenses justly chargeable against defendants and all items, if any they found, representing money drawn by McLennan for the accommodation of Wick and received by the latter. It is apparent that the jury has passed upon the very issues that appellee says this court can

pass upon. How the jury could have arrived at the answers to questions 6 and 7 is a mystery, but the answer to No. 6 is not attacked and must stand, while the answer to No. 7 cannot be sustained.

Assignment No. 7 is sustained.

[7] Plaintiff testified that certain items in the account of advancements pleaded by defendants were for money not paid to him; that Wick drew checks on the Victoria bank, and, desiring to cash same in Lincoln, made them payable to McLennan, who cashed them and handed the money to Wick. Wick denied this testimony. Thereupon he was asked if he had not induced Mrs. McLennan, in the absence of her husband, to accompany him to a bank in Lincoln, and indorse a check for $200, payable to her, and whether the money was not paid to him and retained by him. He admitted giving the check and receiving the money, but testified it was a payment on her husband's commission account, and that after they left the bank he gave her the money. He stated that on account of some trouble with the bank Mrs. McLennan did not want to draw the money herself. Plaintiff then introduced the depositions of Mrs. McLennan in which she stated that Wick asked her to indorse for purposes of identification, and that she received no part of the money. Plaintiff also introduced the depositions of the employé of the bank, who testified that Mrs. McLennan hesitated to indorse, whereupon Wick said, "This is only for purpose of identification;" that he paid the money to Wick. All of this testimony relating to the transaction between Wick and Mrs. McLennan was objected to as irrelevant, and on the further ground that the witness could not be impeached on a collateral matter. We do not think that the fact that Mrs. McLennan, in the absence of her husband, was asked to identify Wick at the bank so as to enable him to draw money, would tend to prove that certain checks given by Wick to McLennan were given under the same circumstances. Stuart v. Kohlberg, 53 S. W. 596; Drumm-Flato Corn Co. v. Meat Co., 33 Tex. Civ. App. 587, 77 S. W. 634; Dooley v. Boiders, 128 S. W. 690; Kingsbury v. Bank, 30 Tex. Civ. App. 387, 70 S. W. 551. Assignments 8, 9, and 10 are sustained.

[8] By the eleventh assignment complaint is made of the admission of the testimony of P. E. Nispel to the effect that he had a commission contract with McLennan, and that he claimed a commission of $2 per acre on the Nispel-Krause deal, but defendants had not paid the same, and in fact had declined to pay it. Plaintiff sued for commission on the Nispel-Krause deal, and defendants admitted he was entitled to a commission, but there was a contest as to the amount, defendants contending it was $320, and plaintiff that it was $640. No contention was made by defendants that they had paid any part of the commission to any one else, or that they were liable for same to any one else. Nispel's testimony was irrelevant to the only issue to be decided. The assignment is sustained.

[9] Appellants' twelfth assignment of error reads as follows:

"The court erred in refusing to give charge No. 1, requested by the defendants, which is as follows: 'You are instructed to return a verdict for the defendants in this case for the reason that it appears from the contract and accompanying transfer thereupon introduced in evidence in this case, that plaintiff's claim for commission under said contract was duly assigned by the plaintiff to Lula I. McLennan, and therefore the claim for said commissions, if any, is due and belongs to the said Lula I. McLennan, for the reason that the contract introduced in evidence and the assignment attached to same, which said assignment was also introduced in evidence by the plaintiff and defendants, shows that the proceeds due and to become due to plaintiff, if any, under said contract was assigned to Lula I. McLennan, and the plaintiff therefore has no cause of action for same."

The instrument referred to in said assignment, which was attached to the contract sued upon, reads as follows:

"October 24, 1911.

"It is hereby agreed between the first and second parties to the above contract that all the commissions earned or to be earned on this contract shall be assigned to Lula I. McLennan. [Signed] L. W. McLennan. Wick-Fowler Colonization Co., by Frank W. Wick, Mgr."

There is no testimony with regard to the situation of the parties, nor of any acts or declarations from which the intention can be ascertained. Must this instrument be construed as an assignment to Mrs. McLennan of the commissions, or is it merely an unenforceable promise or agreement to make a future assignment? Literally, it is the latter, but it is not at all certain that the literal meaning was intended. However, construing the instrument with the light before the court, we are not prepared to say that he erred.

The judgment is reversed, and the cause remanded.